**Valencia MILLS, et al.,**

v.

**Robert R. FREEMAN, et al.**

**Civil No. 1:68–CV–11946–WCO.**

United States District Court,
N.D. Georgia,
Atlanta Division.

June 12, 1996.

friend, Harold M. Armstrong, and Haraja El–Shabazz, Jihan El–Shabazz, minors, by their parents and next friends, Asahita El–Shabazz, Narwanna El–Shabazz, James Somerville, a minor, by his mother and next friend, Carolyn Saunder, and Nathan Jones, a minor, by his parents and next friends, Carolyn Jones, Wayne Jones, and Nadrah Falah, Malik Falah, Mangoor Falah, Salim Sabir, minors, by their parents and next friends, Mahasin Sabir, Adib Sabir, and Christina Thomas, a minor, by her mother and next friend, Grace Thomas, and Michael Creamer, Steven Creamer, and Nicholas Creamer, minors, by their mother and next friend, Marguerite Creamer, and Sandi Bailey, Karla Bailey, minors, by their parents and next friends, Evelyn Bailey, Larry Bailey, and Brandon Russell, a minor, by his parents and next friends, Karen Russell, Kevin Russell, and Michael Perry, Gerald Perry, Lacy Perry, minors, by their mother and next friend, Nina Perry, Darius McVay, Kevin McVay, minors, by their father and next friend, William McVay, and Julia Stewart, a minor, by her mother and next friend, Rose Stewart, Jeezanhay Blake, Halani Blake, Tashiana Blake, minors, by their mother and next friend, Betty Blake.

Charles Spurgeon Johnson, III, Peterson Dillard Young Asselin & Wilson, Atlanta, GA, Boykin Edwards, Jr., Office of Boykin Edwards, Jr., Decatur, GA, for intervenor-plaintiff Ann Trippe Johnson.

Gary M. Sams, Weekes & Candler, Decatur, GA, for defendants Robert R. Freeman, Superintendent, Elizabeth Andrews, Norma Bergman, Phil McGregor, Lyman Howard, Donna Wagner, David Williamson, Paul Womack, DeKalb County Board of Education, members.

Willie Abrams, Edward A. Hailes, Jr., Baltimore, MD, for plaintiffs Valencia Mills, a minor, by her parents and next friends, Berta Mills, Roger Mills, and Adesina Scott, Adreana Scott, Ardona Scott, minors, by their parents and next friends, Cynthia Scott, Major Scott, and Ashley Armstrong, B'randi Armstrong, minors, by their father and next

## ORDER

O'KELLEY, District Judge.

The captioned case is before the court for consideration of the DeKalb County School System's ("DCSS") motion for final dismissal of this case. Plaintiffs and intervenor-plaintiffs oppose this motion.

### Procedural History of the Case

This case has been active for over a quarter of a century. Historically, DCSS maintained a segregated or "dual" system. Functionally, there were separate systems for black and white students. The constitutionally untenable nature of such a system was resoundingly and unanimously proclaimed by the United States Supreme Court in 1954. "[I]n the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal." *Brown v. Board of Education,* 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954). The ultimate import of *Brown* was a mandate that all school systems eliminate racial classifications, and the vestiges thereof, and establish and maintain a system which would afford equal opportunity to all students, irrespective of race. As demonstrated by the longevity of the case at bar, the road to the destination paved by *Brown* has been one which was neither easily nor expeditiously traveled.

The case *sub judice* was filed as a class action in 1968 by certain black students and their parents on behalf of all black students in DeKalb County, Georgia. The gravamen of the complaint was that the DCSS had operated a racially segregated school system in contravention of the United States Constitution. The DCSS proposed a plan to implement a formal desegregation process. This plan was embodied in a consent order entered in June, 1969, which approved the plan and enjoined defendants from discriminating on the basis of race. In the intervening period in which the court has retained jurisdiction over the case to assure the implementation of the consent order, instances of actual judicial intervention have been limited. Those instances, chronicled in this court's order of June 30, 1988 (the "1988 Order"), can be summarized as follows:

> *1976*—The court ordered DCSS to modify its M–to–M program (majority-to-minority)[1] to provide free transportation, reassign faculty and staff to approximate system-wide percentages, and created a bi-

racial committee to oversee future changes.

> *1977*—The court approved a proposed boundary change for Flat Shoals elementary school.

> *1978*—The court denied a motion to exclude kindergarten and special education programs from the M–to–M program.

> *1979*—The court denied a motion to modify the 1976 order concerning the M–to–M program. In short, the court concluded that the changing racial composition of the southern schools was due to demographic shifts, rather than the program itself.

> *Early 1980's*—The court ruled on complaints raised by plaintiffs pertaining to particular schools. The rulings were ultimately a split verdict; each side prevailed as to one of the two schools at issue.

The next significant involvement on the part of the court was precipitated by the defendants' motion filed on January 16, 1986. That motion sought final dismissal of this case. The court ruled on that motion in the 1988 Order.

In order to grant affirmative relief for defendants on the pending motion, the court must determine that a "unitary" system is in operation. The court concluded in the 1988 Order that DCSS was in compliance with a number of factors set forth by the United States Supreme Court in *Green v. School Board of New Kent County,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Specifically, the court found that DCSS was in compliance in the following categories: student assignments, transportation, physical facilities, and extracurricular activities. The court did not dismiss the case in its entirety though, because the DCSS was found not to be "unitary" in respect to faculty assignments and resource allocation. The latter of the two, resource allocation, was considered in tandem with "quality of education," which is not distinctly categorized in *Green, supra.*

This court's ruling was ultimately reviewed by the United States Supreme Court. *Freeman v. Pitts,* 503 U.S. 467, 112 S.Ct. 1430,

---

**1.** The M–to–M program permitted any student, black or white, to transfer from a school in which he or she was a member of the racial

majority to one in which he or she would be a member of the racial minority.

118 L.Ed.2d 108 (1992). The *Freeman* court held that it was appropriate, if the facts warranted, for the district court to relinquish supervision incrementally. *Id.* at 492, 112 S.Ct. at 1446. Further, the Court sanctioned the use of a "quality of education" analysis, notwithstanding its absence from the *Green* paradigm. *Id.* at 492–93, 112 S.Ct. at 1446–47. The case was remanded to the Eleventh Circuit. *Id.* at 500, 112 S.Ct. at 1450. In remanding the case to the Eleventh Circuit, the Supreme Court, in effect, affirmed this court's treatment of the issues in the 1988 Order. The Eleventh Circuit then proceeded to return the case to this court. Because *Freeman* establishes the governing principles for the adjudication of the pending motion, further exploration of the Court's holding is warranted.

 The Supreme Court's ruling was an affirmation of this court's approach to reviewing the question of ultimate dismissal. It is now a settled principle of post–*Brown* jurisprudence that "[a] federal court in a school desegregation case has the discretion to order an incremental or partial withdrawal of its supervision and control." *Freeman*, 503 U.S. at 488, 112 S.Ct. at 1444. Moreover, while the ultimate objective of judicial supervision is to fashion an equitable remedy which will remove both the direct and indirect consequences of a deliberately segregated school system, the Court recognized that the restoration of local control is also a paramount concern. *Id.* at 489, 112 S.Ct. at 1445 (*citing Milliken v. Bradley,* 433 U.S. 267, 280–81, 97 S.Ct. 2749, 2757–58, 53 L.Ed.2d 745 (1977)). "Partial relinquishment of judicial control, where justified by the facts of the case, can be an important and significant step in fulfilling the district court's duty to return the operations and control of schools to local authorities." *Id.* The Court, approving of this court's preference for a surrender of it supervisory role on an as-warranted basis, established a non-exclusive list of criteria for a district court to consider:

> [W]hether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of law and the Constitution that were the predicate for judicial intervention in the first instance.

*Id.,* 503 U.S. at 491, 112 S.Ct. at 1446. Lastly, in specific regard to the DCSS case, the Court concluded that the Eleventh Circuit erred in holding that this court lacked the discretion, as a matter of law, to dismiss the case as to those areas in which unitary status had been achieved.

In accordance with the Supreme Court's ruling, the Eleventh Circuit remanded the case to this court.

> The issues to be considered by the district court should include, but not necessarily be limited to, faculty and staff assignments (which may or may not involve a re-examination of student assignments), resource allocation, the quality of education being received by all students and the good faith commitment of the school district.

*Pitts v. Freeman,* 979 F.2d 1472 (11th Cir. 1992). This court entered an order on September 27, 1994. That order provided: "Defendants are hereby directed to provide all information necessary to the court concerning the following issues: (1) teacher allocation and (2) per pupil expenditures. Defendants may also submit a brief on the question of why they contend that there are no further issues for this court to determine." Order of September 27, 1994, at 1. Two extensions of time to comply with that order were granted. On September 8, 1995, pursuant to a teleconference conducted two days earlier, the court ordered the following:

> Based on holding of *Freeman, supra,* the court finds that in order to dismiss this case it must enter a finding of "full compliance" as to the remaining *Green* factors, namely faculty assignments and resource allocation. This is consistent with the

court's September 27 order, which instructed the DCSS to submit evidence as to teacher allocation and per pupil expenditures, which are functional synonyms for the two remaining *Green* factors noted by the Supreme Court. Further, as indicated in this court's order dated June 30, 1988, and supported by the Supreme Court's acknowledgment of the flexibility of the *Green* inquiry, *Freeman, supra,* 503 U.S. at 492–93, 112 S.Ct. at 1446–47, the court also must be satisfied that the quality of education is consistent throughout the DCSS. This can be ascertained in large part by a thorough examination of resource allocation, but the court is not restricted to that evidence alone. It is important to emphasize that the court will not revisit those *Green* factors in which full compliance was previously found to exist. Lastly, the *Freeman* opinion requires this court to certify that the DCSS has acted in good faith in the implementation of the desegregation decree. " 'The District Court should address itself to whether the Board had complied in *good faith* with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable.' " *Id.* at 492, 112 S.Ct. at 1446 (*quoting Board of Education of Oklahoma City Public Schools v. Dowell,* 498 U.S. 237, 249–50, 111 S.Ct. 630, 637–39, 112 L.Ed.2d 715 (1991)) (emphasis added).

To summarize, the court finds that three specific issues relevant to the question of "unitariness" require resolution before this case can be dismissed in its entirety:

(1) full compliance with *faculty assignments;*

(2) full compliance with *resource allocation;* and

(3) a demonstration of *good faith* in compliance with the desegregation decree by DCSS.

In addition, before entering an order of final dismissal in this case, the court must be satisfied that the "quality of education" in the DCSS is consistent with both the letter and spirit of the desegregation decree.

Order of September 8, 1995, at 2–4.[2] The court then established a briefing schedule. Hearings were conducted on January 4, 1996, and March 7, 1996.[3]

The foregoing history has brought the court to consideration of the pending motion, which once again seeks a final dismissal of this case, and the complete and unfettered return to local autonomy in the operation of the DCSS. As stated on previous occasions, the court will not revisit those *Green* factors in which a unitary system has already been held to exist. Rather, the court will address only those issues left open by the 1988 Order, and the appellate and Supreme Court review of that order.

■ For the reasons set forth below, the court finds that the time has come to sever the DCSS from federal judicial control. While this court certainly appreciates the critical role the federal courts have played in remedying the vestiges of a constitutionally infirm and morally reprehensible system of segregated public education throughout the United States, the court is also mindful of the imperative to return control of a school system to the local authorities as soon as such system has demonstrated its ability to operate on a unitary basis. "The purpose of a school desegregation decree is to effect a *transition* from a school system tainted with state-imposed segregation to a racially nondiscriminatory school system." *Lee v. Talladega County Board of Education,* 963 F.2d 1426, 1429–30 (11th Cir.1992) (emphasis

---

**2.** The reason for reproducing the substantive portions of the September 8, 1995, order verbatim is that it will provide the analytical framework for the court's discussion of the issues raised by the pending motion.

**3.** The reason for the second hearing was that the intervenor-plaintiffs, as a result of an inadvertent omission of the clerk's office, did not receive

notice of the January 4 hearing. *See* Order of January 19, 1996. The intervenor-plaintiffs entered this case by way of an order dated December 20, 1990. The petition for intervention was premised on their dissatisfaction with the representation being provided by the class representatives at that time.

in the original) (citation omitted). Acknowledgment of the court's transitional role in exercising its equitable powers reflects a recognition that "[n]o single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process." *Milliken v. Bradley,* 418 U.S. 717, 741–42, 94 S.Ct. 3112, 3125–26, 41 L.Ed.2d 1069 (1974). Since the DCSS has achieved a unitary school system, principles of federalism mandate that this court relinquish control to local authorities in this case.

With that background, the court can now proceed to discuss the particular issues which lead to the conclusion articulated above.

### Faculty Assignments

■ The Fifth Circuit has outlined three general criteria for the assignment of faculty: (1) teachers, administrators, and other staff members who work directly with children shall be assigned so that the racial composition of the faculty does not have the effect of designating a particular school as a "black" school or a "white school"; (2) employment decisions affecting these faculty members shall be made without regard to race, color, or national origin; and (3) if a reduction in faculty is necessary, such reduction shall involve the selection of individuals "on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district." *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211, 1217–18 (5th Cir.1969), *cert. denied,* 396 U.S. 1032, 90 S.Ct. 611, 24 L.Ed.2d 695 (1970).[4] Due to the rather ambiguous

*Singleton* criteria for achieving unitary status in the area of faculty assignments, this court adopted a more rigid rule, compliance with which would be deemed to satisfy *Singleton.*

When the school staffs (faculty and administrators) of all schools vary from the system-wide minority staff average by no more than 15%, the DCSS will have obtained substantially (sic) compliance with *Singleton.* Absent extenuating circumstances justifying deviations of more than 15%, the court will not find *Singleton* compliance until all school staffs fall within the established parameters.

1988 Order at 40. Thus, the court created a rebuttable presumption that a standard of deviation of no greater than 15% from the system-wide average would pass muster. Further, the burden was placed on the DCSS to demonstrate this compliance. The Eleventh Circuit expressly affirmed this formulation for this case, while noting that the 15% standard of deviation might not be appropriate in all desegregation cases. *Pitts v. Freeman,* 887 F.2d 1438, 1448 (11th Cir.1989). This finding was not disturbed, or even addressed, by the Supreme Court.

After careful review, the court finds that the DCSS has presented unrebutted evidence to meet the standard set forth in the 1988 Order. This is true both as to the racial distribution of faculty and staff, as well as to the distribution of faculty based on their level of training. The standard is also met in regard to the distribution of faculty based on teaching experience.[5]

In regard to the distribution of black staff as a percentage of a school's staff, the court has compiled the following information based on the evidence submitted by DCSS.

---

**4.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**5.** Although faculty experience and training lends itself to analysis under either "faculty assignment" or "resource allocation," in the interest of consistency the court will examine these areas under the resource allocation heading.

## PERCENTAGE OF BLACK STAFF

| 1992–1993 | Elementary Schools | Secondary Schools |
|---|---|---|
| Avg. % Black Staff | 35.90% | 33.77% |
| Range of All Schools | 21.66—44.39% | 28.15—41.15% |

| 1993–1994 | Elementary Schools | Secondary Schools |
|---|---|---|
| Avg. % Black Staff | 37.46% | 36.04% |
| Range of All Schools | 27.13—47.70% | 29.88—47.62% |

| 1994–1995 | Elementary Schools | Secondary Schools |
|---|---|---|
| Avg. % Black Staff | 37.65% | 38.30% |
| Range of All Schools | 24.89—47.08% | 32.76—50.33% |

| 1995–1996 | Elementary Schools | Secondary Schools |
|---|---|---|
| Avg. % Black Staff | 40.88% | 40.61% |
| Range of All Schools | 31.35—47.77% | 34.21—50.08% |

Analysis of the statistics in the four charts above reveals two important points. First, in no case over the past four academic years has the school with either the lowest or the highest percentage of black staff members varied more than 15 percentage points from the system-wide average for the type of school, under consideration.[6] Second, throughout the school system, at both the elementary and secondary school levels, a steady increase in the percentage of black staff members is discernable. Based on this unrefuted evidence, the court is confident in holding that the DCSS has satisfied the *Singleton* test for faculty assignments.

### Resource Allocation

■ ▪ At the January 4, 1996, oral argument, the DCSS presented the court with a series of scattergrams purporting to display the distribution of average teacher experience and training, as well as per-pupil expenditures. These scattergrams, which plotted schools horizontally based on those with the lowest percentage of black students to those with the highest percentage of black students, are most instructive in what they do *not* exhibit. The scattergrams, a particularly useful tool in light of the quantity of statistics, demonstrate decisively that there is *no pattern* to the allocation of teachers based on experience or training. The random pattern which is visible is indicative of the DCSS' affirmative efforts to provide substantially equal levels of educational opportunity throughout the system. Of course, when dealing in human quotients, such as an individual's experience, exact mathematical parity will never be achieved. Nevertheless, the DCSS has endeavored to be as equitable as possible in the assignment of its human resources, and that effort is borne out by the statistics represented above. As with the case of black staff percentages, the court has prepared a series of tables explaining teacher experience and training.

---

6. The court's reference to "type" of school means elementary versus secondary school, not the "Dentler typology" used in classifying schools based on their ten-year racial composition. *See* 1988 Order at 49–50.

## TEACHER EXPERIENCE

| | Elementary Schools | Secondary Schools |
|---|---|---|
| **1992–1993** Avg. Teacher Experience (Years) | 12.19 | 13.70 |
| Range of All Schools | 7.87—17.01 | 8.21—17.31 |
| **1993–1994** Avg. Teacher Experience (Years) | 12.38 | 13.62 |
| Range of All Schools | 7.31—17.81 | 8.39—17.44 |
| **1994–1995** Avg. Teacher Experience (Years) | 12.36 | 14.34 |
| Range of All Schools | 7.61—17.17 | 8.68—17.34 |
| **1995–1996** Avg. Teacher Experience (Years) | 12.70 | 13.37 |
| Range of All Schools | 8.05—16.94 | 9.81—17.48 |

## TEACHER TRAINING

| | Elementary Schools | Secondary Schools |
|---|---|---|
| **1992–1993** Avg. Teacher Training (Years) | 4.56 | 4.81 |
| Range of All Schools | 4.30—4.88 | 4.50—5.03 |
| **1993–1994** Avg. Teacher Training (Years) | 4.63 | 4.80 |
| Range of All Schools | 4.30—4.93 | 4.53—5.01 |
| **1994–1995** Avg. Teacher Training (Years) | 4.63 | 4.79 |
| Range of All Schools | 4.35—4.87 | 4.54—5.08 |
| **1995–1996** Avg. Teacher Training (Years) | 4.62 | 4.78 |
| Range of All Schools | 4.39—4.82 | 4.48—5.07 |

A number of observations about the foregoing statistics merit attention. First, the statistics clearly demonstrate a degree of consistency over the four-year period analyzed. The consistency which is evident throughout this period belies any claim that the allocation of human resources on an equitable basis is a statistical quirk or a one-time effort crafted to withstand judicial scrutiny. Second, insofar as the factor of teacher experience is concerned, there is simply no evidence to suggest that those teachers with the least experience are clustered in those schools with the heaviest concentration of black students. While it is true that there is a wide range of disparity in the amount of experience at *all* the DCSS schools, the court cannot find that this variance is correlative to the racial composition of the numerous DCSS schools, nor can the court find that the variance is a product, either direct or indirect, of unlawful conduct by the DCSS.

Plaintiffs take particular issue with this conclusion, and therefore the court will en-

deavor to address the specific objections raised by plaintiffs. The intervenor-plaintiffs, interpreting the same statistics analyzed by the court, draw a markedly different conclusion. Response of Plaintiff–Intervenors to Defendants' Proposed Findings of Fact and Conclusions of Law at 20–23. Initially, the intervenor-plaintiffs take issue with the DCSS' decision to present the evidence in the form of a scattergram, arguing that this form of presentation tends to obscure the disparity between "black" and "non-black" schools. This objection necessitates a brief discussion of the changing demographics in DeKalb County. For example, in the 1995–1996 school year only nine elementary schools and no secondary schools had a majority white population. Defendants' Reply Brief in Support of Final Dismissal and In Response to Order of September 8, 1995, at 13. Thus, continuing to rely on the typology of classifying any school

which does not have a greater than 50% black student population as "white" is largely misleading. This recognition is not tantamount to an effort "at the eleventh hour to escape the plain fact that this case is about discrimination against black students." Response of Plaintiff–Intervenors to Defendants' Proposed Findings of Fact and Conclusions of Law at 20–21, n. 20. Rather, the demographic shift in DeKalb County, namely the measurable growth in non-black minorities, i.e., those of Hispanic and Asian origins, is an unrefutable fact. Moreover, plaintiff-intervenors do not question the accuracy of the information represented in the scattergrams but merely contest the conclusions to be drawn from that information. To support their argument, the plaintiff-intervenors presented the information in a different form than either the DCSS' scattergrams or the court's tables set forth above.

| YEAR | AVG. STAFF EXPERIENCE GREATER THAN 13 YEARS | | AVG. STAFF EXPERIENCE LESS THAN 10 YEARS | |
|---|---|---|---|---|
| | BLACK SCHOOLS | NON–BLACK SCHOOLS | BLACK SCHOOLS | NON–BLACK SCHOOLS |
| 1989–90 | 3 | 3 | 16 | 0 |
| 1990–91 | 6 | 12 | 15 | 3 |
| 1991–92 | 13 | 15 | 5 | 1 |
| 1992–93 | 11 | 14 | 11 | 1 |
| 1993–94 | 18 | 16 | 9 | 1 |
| 1994–95 | 17 (38%) | 17 (52%) | 10 (22%) | 1 (3%) |
| 1995–96 | 20 (39%) | 16 (64%) | 8 (16%) | 0 (0%) |

Response of Plaintiff–Intervenors to Defendants' Proposed Findings of Fact and Conclusions of Law at 22.

■ Based on the facts represented in the foregoing table, plaintiff-intervenors contend that DCSS has not achieved *Singleton* compliance in the area of resource allocation, specifically as to the distribution of faculty based on experience. The court disagrees. As a preliminary matter, the table shows an increase in the number of "black schools" with teachers having greater than thirteen

years experience over the time shown. Likewise, an overall decrease is evident in the number of "black schools" with teachers having less than ten years experience, notwithstanding certain upward or downward movements between any given two year period. Second, while the *proportion* of "black schools"[7] with less experienced teachers remains troubling, it cannot be said to be symptomatic of any racially identifiable discrimination, nor can it be deemed a vestige of the original *de jure* discrimination which was

7. The percentage figures represent a percentage of the total number of schools in that particular category.

the genesis of this lawsuit. Stated differently, there simply is no pattern. The court is not suggesting that there is not room for improvement. Indeed, the court would encourage the DCSS to continue to make efforts to allocate resources not only in an equitable fashion but also with consideration to those schools and students who would most benefit from the addition of further resources. That said, observing that there is room for improvement is not the same as saying that the DCSS has failed to comply with the court's directive. It must be reiterated that this court's mandate is a limited one and "that local autonomy of school districts is a vital national tradition ... and that [this] court *must* strive to restore state and local authorities to the control of a school system operating in compliance with the Constitution." *Missouri v. Jenkins,* — U.S. —, —, 115 S.Ct. 2038, 2054, 132 L.Ed.2d 63 (1995) (citations omitted) (emphasis added). This court is convinced that the DCSS, both in regard to allocation of teachers based on experience and training, is operating within the parameters mandated by the Equal Protection clause of the United States Constitution. This court is not prepared, nor is it authorized, to retain an on-going supervisory role any longer than is necessary to ensure constitutional compliance. The DCSS' conduct has met this threshold.

Consideration of a third area of resource allocation, per pupil expenditure, is also necessary prior to a declaration of unitary status, and this category too is aided by an examination of the relevant statistics.[8]

## PER PUPIL EXPENDITURES

| 1992–1993 | Elementary Schools | Secondary Schools |
|---|---|---|
| Avg. Per Pupil Expenditure | $4607.94 | $5009.90 |
| Range of All Schools | $3505.64—6491.83 | $4243.23—6292.24 |
| **1993–1994** | Elementary Schools | Secondary Schools |
| Avg. Per Pupil Expenditure | $4828.08 | $5088.85 |
| Range of All Schools | $3775.31—6533.46 | $4340.50—6423.15 |
| **1994–1995** | Elementary Schools | Secondary Schools |
| Avg. Per Pupil Expenditure | $4994.86 | $5373.29 |
| Range of All Schools | $3798.41—7191.17 | $4196.75—6629.12 |

Once again, a detailed examination of the statistics as set forth in the scattergram submitted by the DCSS demonstrates the absence of any pattern of discrimination in allocating per-pupil expenditures. While there is a broad range in the per pupil expenditure figures, it is clear that, in terms of absolute dollars, the expenditures have increased from one year to the next in each year portrayed above. As was the case with teacher experience, plaintiff-intervenors have elected to present the statistics in a different format. Focussing on the 1992–1993 school year, plaintiffs tabulated the following chart, excluding magnet schools.[9]

8. No data is available for the 1995–1996 school year.

9. Plaintiff-intervenors exclude the magnet schools because they believe that inclusion of such schools distorts the results. They argue that if greater per-pupil expenditures are devoted to magnet programs within majority black schools, there will be a distortion of the overall figure attributable to the concentration of re- sources in the magnet program. This allocation of resources, thus, may benefit white (or black) students in the magnet program at the expense of those indigenous black students at the school. Response of Plaintiff-Intervenors to Defendants' Proposed Findings of Fact and Conclusions of Law at 19 n. 17. The court does not accept the premise of this argument. Inasmuch as the establishment of the magnet programs was an element of the comprehensive desegregation plan

## 1992–1993 PER–PUPIL EXPENDITURES (EXCLUDING MAGNET SCHOOLS)

| SCHOOL POPULATION GROUP | AVERAGE FOR GROUP (APPROX.) | SCHOOLS IN GROUP |
|---|---|---|
| 10%– 20% Black | $ 5050 | 2 |
| 50%– 60% Black | 4850 | 4 |
| 90%–100% Black | 4770 | 18 |
| 0%– 10% Black | 4750 | 2 |
| 30%– 40% Black | 4650 | 12 |
| 20%– 30% Black | 4550 | 6 |
| 40%– 50% Black | 4470 | 11 |
| 80%– 90% Black | 4350 | 5 |
| 60%– 70% Black | 4200 | 6 |
| 70%– 80% Black | 4200 | 5 |

Response of Plaintiff–Intervenors to Defendants' Proposed Findings of Fact and Conclusions of Law at 19. Based on the foregoing chart, plaintiff-intervenors observe that the greatest expenditure was at those schools with a 10%–20% black population; the lowest expenditure was at those schools with a 60%–80% black population. The same chart also reveals, though, that the eighteen schools with between 90%–100% black students, as well as the four schools with between 50%–60% black students, were at the high end of the expenditure charts. For the school year 1994–1995,[10] the average per-pupil expenditure at predominantly black schools was $4,995.89; at predominantly white schools, the average per-pupil expenditure was $5,068.48.[11] These figures include magnet schools. If magnet schools are excluded, the respective figures are $4,928.41 and $5,037.51. Response of Plaintiff–Intervenors to Defendants' Proposed Findings of Fact and Conclusions of Law at 20. Plaintiff-intervenors argue that this disparity fails to comply with the court's 1988 Order and, thus, cannot support a finding of unitary status. The court disagrees. The court finds that the DCSS has complied with the order to "attempt to equalize per-pupil expenditures during the 1988–89 school year." Order of June 30, 1988, at 58. At this juncture, far

more important than the statistics from 1988–1989, is the trend which has been evidenced since that time. While it is obvious that the expenditures at each type of school, regardless of how they are grouped, are not identical, the court does not believe that the differentials are so great as to warrant a continuing supervisory role for the court. Moreover, there simply is no evidence to suggest that whatever disparity does exist is the product of the long removed *de jure* dual school system.

### Quality of Education

■ In terms of quality of education, the court noted the progress of the DCSS in its 1988 Order.

While there will always be something more that the DCSS can do to improve the chances for black students to achieve academic success, the court cannot find, as plaintiffs urge, that the DCSS has been negligent in its duties to implement programs to assist black students. The DCSS is a very innovative school system. It has implemented a number of programs to enrich the lives and enhance the academic potential of all students, both blacks and whites. Many remedial programs are tar-

for the DCSS, it seems somewhat disingenuous to use the beneficial allocation of resources necessitated by the program in order to argue that the DCSS is appropriating per-pupil expenditures in an unconstitutional manner.

10. These are the expenditures plotted on the scattergram.

11. Recall that any school that is not at least 50% black is classified as predominantly white, even if whites are an actual minority.

geted in the majority black schools. Programs have been implemented to involve the parents and offset negative socio-economic factors. If the DCSS has failed in any way in this regard, it is not because the school system has been negligent in its duties.

Order of June 30, 1988, at 55. Notwithstanding the substantial progress shown by the DCSS in 1988,[12] the court found that the DCSS could not be deemed to have achieved a unitary status as to quality of education due to deficiencies in the allocation of resources. As noted, the court now concludes that any infirmities then existing in the allocation of resources have been cured. This finding, coupled with the rulings vis-a-vis the other *Green* factors set forth by the court in the 1988 Order and by the Supreme Court in *Freeman*,[13] exhausts this court's supervisory role as to all considerations except a good faith determination. "Quality of education" is, admittedly, an amorphous concept. The inability to precisely articulate a definition for this concept, though, should in no way diminish its importance as the fundamental concern in this or any other desegregation case. If there is one common thread in *Brown* and its multiple progeny, it is the assumption by the federal judiciary of a role in which it can, by exercise of its equitable jurisdiction, compel school districts which were once segregated by law to offer each of their children, irrespective of race, a quality of education which is substantially similar[14] to that offered to all other children. "Improving the quality of education for all children, especially black children, is the underlying purpose of all desegregation cases." Order of June 30, 1988, at 56–7. This was the promise of *Brown*, and it is critical to the resolution of the case *sub judice*. Enshrined in the Constitution is the promise of equal opportunity, not equal outcome. This court can do no more than, through the exercise of its equity power, direct a school district to eliminate any and all vestiges of a segregated school system and be certain that all present day educational policies are administered without regard to race. In terms of this latter role, the court may, as it has done throughout the course of this litigation, order a school district to enact certain policies or programs to compensate for historical inequities. Once that mission is complete, however, command of the district's educational policies must be returned to local authorities. This court has never claimed a particular expertise in the field of educational administration, and to pretend otherwise would be an insult to those who have dedicated a career to the education of our children. When, as in the case of the DCSS, the quality of education can be considered equal on a system-wide basis, the court must step aside.

Plaintiffs and plaintiff-intervenors appear to suggest that in order to reach a resolution on the quality of education issue, the court must revisit each of the *Green* factors which are, in a very real sense, subsets of quality of education. This suggestion does not comport with this court's prior orders. Plaintiff-intervenors are correct in stating that the "court's prior observation with respect to individual components of the quality of education never amounted to a finding that the entire area of quality of education was in full and satisfactory compliance with the Constitution." Response of Plaintiff–Intervenors to Defendants' Proposed Findings of Fact and Conclusions of Law at 13. The conclusion drawn from this, however, that "the entire area [of] quality of education remains open for reexamination until such full and satisfactory compliance is achieved," *id.,* is

---

12. The court catalogued some of the more noteworthy programs in its order. Order of June 30, 1988, at 44 n. 15.

13. Plaintiffs accurately note that "[t]he Supreme Court and the Eleventh Circuit clearly sanction the use of a quality of education analysis and this Court should continue to adhere to the acknowledged flexibility of the *Green* inquiry." Mills' Plaintiffs Second Brief in Opposition to Defendants' Motion for Final Dismissal Upon Remand at 13.

14. The court is mindful that "equal" and not "substantially similar" has been the dominant terminology employed throughout most post-*Brown* desegregation jurisprudence. The court uses the latter phrase not to lessen the mandate of the DCSS to provide an equal educational opportunity to all students but rather to emphasize that exact mathematical quantifications are often not practical, or even instructive, in the educational field.

erroneous. Quality of education is an amalgam of different factors. Many of those factors were removed from this case by the 1988 Order. Only those relating to resource and faculty allocation remained for consideration herein. Having considered those factors in the preceding sections, the court is not obliged to address other areas which are part of the composite of quality of education, inasmuch as these other *Green* factors are already "off the table." Accordingly, the court finds that the DCSS has achieved unitary status in the area of quality of education.

### Good Faith

■ The final issue the court must address prior to entering an order of final dismissal is that of good faith. This issue was also addressed by the Supreme Court.

> The requirement that the school district show its good-faith commitment to the entirety of a desegregation plan so that parents, students, and the public have assurance against further injuries or stigma also should be a subject for more specific findings.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> With respect to those areas where compliance had not been achieved, the District Court did not find that DCSS had acted in bad faith or engaged in further acts of discrimination since the desegregation plan went into effect. This, though, may not be the equivalent of a finding that the school district has an affirmative commitment to comply in good faith with the entirety of a desegregation plan, and further proceedings are appropriate for this purpose as well.

*Freeman,* 503 U.S. at 498–99, 112 S.Ct. at 1449–50. Having traveled an additional eight years since issuing the order upon which the Supreme Court's *Freeman* decision was based, this court can today state, with full confidence, that the DCSS has indeed acted in good faith throughout the life of the court's involvement in the implementation of the desegregation order. More importantly,

the court firmly believes that the parents of all children in DeKalb County can be assured that the DCSS will continue to construct and execute educational policy in an equitable and race-neutral fashion.

■ In simplest terms, for as long as this court has been involved with this case, the DCSS has exhibited an uninterrupted pattern of good faith. The mere fact that dismissal was not granted in 1988, i.e., the DCSS had not achieved full unitary status in all respects, is not indicative of any bad faith on its behalf. A good faith inquiry demands an examination of effort and attitude, not simply a calculation of results. If a successful completion of itemized goals were synonymous with good faith, an independent inquiry of this area would be superfluous. Whereas consideration of the *Green* factors is backward looking, asking whether the school system has achieved the prescribed goals, consideration of good faith is forward looking, asking whether the school system's record of performance is indicative or predictive of a future course of conduct which will continue to treat equality of opportunity as a paramount concern.[15] Obviously, to a large degree, this is a speculative endeavor, but the courts have recognized that this line of questioning is a useful device to employ in determining whether a release from federal judicial supervision is appropriate. Viewed through such a spectrum, the court is compelled to find that the DCSS has met the good faith test.

Not surprisingly, plaintiffs and plaintiff-intervenors take issue with this conclusion. Plaintiffs argue that the court should hear evidence from parents of black students and black students themselves in order to adjudicate the DCSS' commitment to the entire decree. Mills Plaintiffs' Second Brief in Opposition to Defendants' Motion For Final Dismissal Upon Remand at 11. The court disagrees. The portion of *Freeman* quoted above did not expressly order the court to conduct an evidentiary hearing on the issue of good faith. The Court did, however, acknowledge the necessity for "further pro-

---

**15.** By necessity, a good faith analysis also looks backward to assess the course of conduct of the school system.

ceedings." *Freeman*, 503 U.S. at 499, 112 S.Ct. at 1450. This court believes that mandate has been met through the submission of various pleadings and evidentiary materials, as well as through the opportunity all sides were afforded to present oral argument. Further opinion evidence is not necessary and would not influence the court's decision based on its extensive experience with the litigants in this case. Plaintiff-intervenors, while concurring in the plaintiffs' position, also have listed eight specific areas which they contend demonstrate a lack of good faith. These factors may be paraphrased as follows:

1. DCSS concentrated its construction plan on areas which did not have a large concentration of black students or a large overcrowding problem;

2. DCSS refused to provide status reports following the conclusion of an interim agreement for the relief of overcrowding, which plan included construction and grade and school reorganization;

3. DCSS has not acknowledged the presence of quality of education as an issue in the case;

4. DCSS has refused to discuss issues with the plaintiff-intervenors and has not allowed them to address the Board;

5. DCSS has hired and promoted individuals with a low expectation for black students;

6. DCSS has not provided meaningful information to allow an evaluation of constitutional compliance in the area of school system operations;

7. DCSS continues to discriminate in the area of resource allocation; and

8. A gap persists in student achievement which cannot be explained by socio-economic factors.

Response of Plaintiff–Intervenors to Defendants' Proposed Findings of Fact and Conclusions of Law at 24–26. While the court appreciates the plaintiff-intervenors' concern as to each of the aforementioned items, the court is not persuaded that these items, taken in whole or in part, manifest a pattern of an absence of good faith by the DCSS. Much of what is itemized above constitutes an apparent disagreement among the parties over the policies and practices of the DCSS. The presence of such a disagreement cannot substantiate a continuation of this case, for were that a basis to deny dismissal, this, and most other desegregation cases, would extend in to perpetuity. The court would urge the DCSS, as well as all plaintiffs, to attempt to work together and in a mutually constructive way to resolve complaints raised by any parents or students as to the educational system. Based on the DCSS' record of conduct, the court is confident that such cooperation will occur.

### Conclusion

In another school desegregation case, the Supreme Court recently observed that the "basic task of the District Court is to decide whether the [factors under consideration] attributable to prior de jure segregation [have] been remedied to the extent practicable." *Missouri v. Jenkins*, —— U.S. ——, ——, 115 S.Ct. 2038, 2055, 132 L.Ed.2d 63 (1995) (discussing a reduction in achievement by minority students). The Court further noted that "[i]nsistence upon academic goals unrelated to the effects of legal segregation unwarrantably postpones the day when the [school system] will be able to operate on its own." *Id.*, at ——, 115 S.Ct. at 2056. Assigned with this task, this court has no choice but to grant the DCSS' motion for final dismissal.

■ This court, though possessing broad remedial and equitable powers, had a limited role to play in the desegregation of the De-Kalb County school system. Namely, once a constitutional violation was identified and found to exist, the court was to retain jurisdiction over the case until the effects of that constitutional violation were eviscerated. The assignment was "to correct, by a balancing of the individual and collective interests, 'the condition that offends the Constitution.' A federal remedial power may be exercised 'only on the basis of a constitutional violation' and, '[a]s with any equity case, the nature of the violation determines the scope of the remedy.'" *Milliken v. Bradley*, 418 U.S. 717, 738, 94 S.Ct. 3112, 3124, 41 L.Ed.2d 1069 (1974) (quoting *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971)) (al-

teration in the original). The second part of the court's responsibility is "to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution." *Freeman,* 503 U.S. at 489, 112 S.Ct. at 1445 (*citing Milliken v. Bradley,* 433 U.S. 267, 280–81, 97 S.Ct. 2749, 2757–58, 53 L.Ed.2d 745 (1977)). These two requirements must be read in tandem; once the court finds that the constitutional violation has been remedied, it must return control to the school district. This is a mandate, not an option.

This case has reached that point. Nothing this court has done—and nothing this court could do were it to retain jurisdiction indefinitely—can erase the indelible scar on our nation's history left by the legal sanctioning of segregated school systems. The past existence of such a system, the harm of which, both legal and sociological, underscored much of the reasoning in *Brown,* will forever be viewed as a profound injustice in the history of a nation which so prides itself on fundamental concepts of equality and liberty. This history alone, though, cannot continue to be the driving force of educational policy. Having acknowledged this history's presence and remedied its results, it is time for the court to remove itself from the formulation of educational policy in DeKalb County. To hold otherwise would be a disservice to the very population which this case originally was commenced to benefit. "Local control over the education of children allows citizens to participate in decisionmaking, and allows innovation so that school programs can fit local needs." *Board of Education of Oklahoma City Public Schools v. Dowell,* 498 U.S. 237, 248, 111 S.Ct. 630, 637, 112 L.Ed.2d 715 (1991) (citations omitted). The parents of DeKalb County are entitled to regain that measure of control.

Accordingly, after careful consideration of both law and fact, the court finds that the DeKalb County School System has attained unitary status and has fully remedied the constitutional violation caused by its former maintenance of a dual system. All injunctive decrees are hereby dissolved, and the De-Kalb County School System shall hereby resume full control over the operation of the schools which are within its jurisdiction under the laws of the State of Georgia. The DeKalb County School System's ("DCSS") motion for final dismissal of this case is hereby GRANTED.

IT IS SO ORDERED.