Eddie Mitchell TASBY, et al., Plaintiffs,

v.

Yvonne GONZALEZ, General Superintendent, Dallas Independent School District, et al., Defendants.

Civil No. 3:70–CV–4211–H.

United States District Court,
N.D. Texas,
Dallas Division.

June 18, 1997.

Edward B. Cloutman, III, Dallas, TX, for Eddie Mitchell Tasby.

E. Brice Cunningham, Law Office of E. Brice Cunningham, Dallas, TX, for Black Coalition To Maximize Education.

Robert H. Thomas, Strasburger & Price, Dallas, TX, Marcos G. Ronquillo, Ronquillo Law Firm, Dallas, TX, for Dallas Independant School Dist.

Toni Barbara Hunter, Laquita A. Hamilton, Attorney General of Texas, Austin, TX, for Texas Educ. Agency, Michael A. Moses.

## MEMORANDUM OPINION AND ORDER

SANDERS, Senior District Judge.

Before the Court is Defendant School District's Motion to Approve Actions of *Singleton* Variance Committee, filed November 27, 1996, and pleadings related thereto. The parties have submitted substantial briefing in connection with the motion. Plaintiffs generally oppose the motion, while agreeing that certain exclusions and variances in *Singleton* calculations are justified. Intervenor, the Black Coalition to Maximize Education, opposes the motion in its entirety.

The Court held an evidentiary hearing on issues raised by the motion on May 27 & 28, 1997, and heard oral argument on the motion on June 5, 1997.

### I. Background

In its 1994 Unitary Status Order, the Court recounted the protracted history of desegregation litigation involving the Dallas Independent School District (the "School District" or "DISD"). See *Tasby v. Woolery,* 869 F.Supp. 454, 456–57 (N.D.Tex.1994). As the Court noted at that time, the ethnic composition of the DISD has changed considerably since this suit was filed in 1970. In 1970–71, the student population was 58.2% Anglo, 33.4% Black, and 8.4% Hispanic.[1] By

---

1. The 1982 Judgment uses the following ethnic and racial divisions: Black, Hispanic, and Anglo.

The Court retains this terminology for the sake of consistency.

1981, the ethnic composition was 29.53% Anglo, 49.61% Black, and 19.44% Hispanic. *Tasby v. Wright*, 520 F.Supp. 683, 693 (N.D.Tex.1981). Today, total enrollment in the DISD is approximately 155,000 students. The student body is approximately 10.9% Anglo, 41.5% Black, 45.5% Hispanic, and 2% other. (School District's Report to the Court, filed Feb. 18, 1997, at 6).

The dramatic growth in Hispanic enrollment in recent years is most remarkable, while Anglo enrollment has fallen and Black enrollment has slightly decreased in terms of percentage. These trends are expected to continue. By the year 2000, it is estimated that 55% of students in the DISD will be Hispanic. (Gonzalez).[2] Currently, approximately 30% of DISD students are designated as having limited English proficiency (LEP), and this percentage is projected to increase. (Gonzalez). The School District faces a severe shortage of bilingual and English–as–a–Second–Language (ESL) teachers. The School District estimates that it needs an additional 545 bilingual teachers to serve student demand. (DeHart). Among LEP students, over 60 different languages are spoken, with Spanish being the most common primary language. (DeHart Depo.).

In the Fall of 1996, the School District had a total of 9,114 teachers. (Webster). The DISD experiences turn-over of between 500 and 700 teachers annually. (Escobedo). Over the past several years, the ethnic breakdown of teachers in the School District has been approximately 53% Anglo and other, 37% Black, and 8% Hispanic. (Interv. Ex. 14). The Court has previously noted that the DISD has an affirmative action plan to recruit minority teachers. *Tasby*, 869 F.Supp. at 469. The School District's efforts to recruit Black teachers have been relatively successful, while recruitment of Hispanic faculty has been difficult. *Id.* The Court is impressed by the commitment of the current Superintendent, expressed during her testimony at the recent hearing, to increase the number of minority teachers and achieve a multi-ethnic faculty on all campuses. (Gonzalez).

**2.** Parenthetical citations refer to live testimony at the hearing, exhibits, or other documents submit-

## II. The Singleton Issue

The School District's motion raises the issue of faculty assignment. Desegregation of a school district's faculty is an essential facet of dismantling an unconstitutional, dual system. *See Green v. County Sch. Bd. of New Kent County*, 391 U.S. 430, 435, 88 S.Ct. 1689, 1692–93, 20 L.Ed.2d 716 (1968).

### A. The Role of Singleton in This Case

At the time this litigation began, teacher assignment within the DISD was premised on the race of the students in segregated schools. *Tasby*, 869 F.Supp. at 456, 470. Since the earliest stages of this case, teacher-assignment ratios have been used as a tool to eliminate the system of racially-identifiable schools. *See Singleton v. Jackson Mun. Separate Sch. Dist.*, 419 F.2d 1211, 1217–18 (5th Cir.1969). The Court has always directed that the School District assign teachers in conformance with *Singleton*; that is, the School District has been required to assign teachers in such a way that the ethnic distribution of teachers in each school matches the ethnic distribution of teachers District-wide.

In 1971, the Court (Taylor, J.) ordered the School District to comply with *Singleton* by re-assigning 4,400 teachers. (Collins); *see also Tasby v. Estes*, 342 F.Supp. 945, 953 (N.D.Tex.1971). The DISD was allowed a plus or minus 2.5% tolerance from the required ratios. In its 1982 Judgment, the Court (Sanders, J.) retained the *Singleton* requirement, but granted the School District some discretion to assign minority teachers outside of strict *Singleton* requirements "in order to staff and administer the programs in predominantly minority schools, or such programs as special, vocational, and bilingual education in any school." *Tasby v. Wright*, 542 F.Supp. 134, 149 (N.D.Tex.1982).

At the request of the School District, the Court's 1994 Unitary Status Order expanded the tolerance to allow a plus or minus 15% deviation from *Singleton* requirements. The Court also directed the School District to do the following:

ted in connection with the School District's motion.

1. Achieve full compliance with *Singleton* ratios (plus or minus 15% tolerance) by the beginning of school in Fall 1996;

2. Document the reasons for granting waivers to schools from *Singleton* compliance;

3. Ensure that teacher assignments to achieve *Singleton* compliance do not place a disproportionate number of inexperienced minority teachers in predominantly minority schools.

*Tasby,* 869 F.Supp. at 472. Final dismissal of this case was conditioned on compliance with these and certain other requirements set forth in the 1994 Order. *See id.* at 478.

### B. The Current Situation with Respect to Singleton

It is clear that the School District has not complied with the Court's orders with respect to *Singleton.* At the evidentiary hearing, DISD administrators testified unambiguously that the School District did not achieve compliance by Fall 1996, as directed, and is not in compliance now. (Webster; Collins). Nor has the DISD shown marked improvement toward that goal. In the 1992–93 school year, 97 of 191 schools were out of compliance with *Singleton,* even applying a 15% tolerance. *Tasby,* 869 F.Supp. at 470. Today, using the 15% tolerance, more than 80 of 211 campuses are still out of compliance. (Webster).

The primary tools the School District has used in working toward *Singleton* compliance are ordinary attrition and turn-over. The DISD has also relied on other methods, such as the Alternative Certification Program, to increase ethnic balance at individual schools. Since Judge Taylor's 1971 order, the DISD has never used involuntary transfer of teachers as means of achieving compliance. (Webster; Escobedo). Although it uses transfers to level class sizes and resolve personality conflicts, the School District has not had the will to use involuntary transfers for *Singleton* purposes because of the anticipated disruptions that would result. (Collins). Until very recently, the School Board had not discussed the possibility of using involuntary transfers for this purpose. (Leos; Brashear; Ewell). However, it appears that the administrative staff has had some such discussions. (Def. App. I, Tabs 6, 11).

As of November 1, 1996, of the 9,114 teachers employed by the DISD, 3,320 were excluded from *Singleton* calculations, leaving 5,794 who were considered for *Singleton* purposes. (Webster). The School District has interpreted the Court's orders as allowing teachers in bilingual/ESL, vocational, and special education to be excluded from consideration when determining a school's *Singleton* compliance. (Webster; Def. Ex. 16). The School District has also considered teachers in the Court-mandated Learning Centers as exempt. (Collins; Def. App. I, Tab 12). The School District justified these exclusions based on the fact that bilingual/ESL, vocational, and special education teachers have particular specialties and that not all programs in these areas exist on all campuses. The School District also notes that state and federal law mandate that the DISD offer bilingual education to those students who need it. (DeHart). The School District maintains that the need to assign teachers in these four areas in accordance with programmatic necessity justified their exclusion from *Singleton.* The Court concludes that these exclusions were warranted.[3]

### C. The Singleton Variance Committee

Following this Court's 1994 Unitary Status Order, the School District prepared and the School Board approved a *Singleton* Implementation Plan. (Def. Ex. 16). Principals were reminded of their obligation to consider *Singleton* requirements in making staffing decisions. The Implementation Plan also established procedures for schools with exceptional circumstances to apply to a District-created committee for a variance from *Singleton* requirements. This *Singleton* Variance Committee consisted of five DISD administrators and the Area Assistant Su-

**3.** To say that these teachers were subject to "exclusions" means that they were not included in *Singleton* calculations for any purpose. By contrast, teachers granted a "variance" were considered for purposes of the District's overall *Singleton* calculations, but their assignment to a particular campus was deemed not to violate that school's *Singleton* requirement.

perintendent responsible for the applying school. Pursuant to the documentation requirement of the Court's 1994 Order, the School District's current motion submits the Committee's minutes and seeks Court approval of the variances granted.

Over the approximately two years that the Committee has operated, different forms of variance have been considered and granted. Initially, the Committee considered only individual variances requested by schools needing to fill specific positions when a candidate of the required ethnicity was unavailable. In deciding whether to grant an individual variance, the Committee considered whether the principal had made good-faith efforts to find a teacher of the needed ethnicity. The minutes of the Committee's meetings indicate that over 30 such individual variances were approved or conditionally approved. (Def. App. I). Fourteen individual variances were granted to Anglo teachers, despite the fact that the 1982 Judgment provides only for assignment of minority teachers at variance with *Singleton. Tasby*, 542 F.Supp. at 149.

Beginning in the Fall of 1996, the Variance Committee began considering two other forms of variance. The Committee decided to grant a "blanket" waiver to all schools that were only one or two teachers out of compliance with *Singleton* requirements. (Def. App. I, Tab 12). The rationale for this decision was that constant turnover, especially in small schools, could cause a campus to slip in and out of *Singleton* compliance over the course of a year. The "blanket" waiver was intended to eliminate the need to constantly move teachers or consider individual variances due to small shifts in personnel. (Webster). At about the same time, the Committee adopted a procedure for granting "campus-wide" waivers. (Def. App. I, Tab 11). Campus-wide waivers were developed to deal with the problem of schools that were chronically out of compliance by a relatively large number of teachers. (Escobedo). In deciding whether to grant a campus-wide waiver, the Committee considered a school's programmatic needs, its history of compli-

ance problems, and the efforts of the principal to recruit teachers of the required ethnicity. In all, campus-wide waivers were granted to 18 schools and denied to 17 schools that applied. Many of the campus-wide waivers were granted to predominantly-Black schools that had persistent problems hiring or retaining Anglo teachers. (Lewis, Brew, & Stokes Depos.). In many instances, these schools' failure to comply with *Singleton* was attributed to relatively low turn-over of experienced Black teachers.

The School District's motion presents all of these variances—individual, blanket, and campus-wide—to the Court for approval. In the alternative, the School District has suggested that the Court re-visit the applicability of *Singleton* to the DISD under present circumstances. See DISD Brief, filed Feb. 10, 1997. The School District has also proposed that the Court adopt an alternative to *Singleton* for evaluating faculty desegregation: the 75–25 Plan.

### III. The 75–25 Plan

As an alternative to the *Singleton* ratio, the School District proposes a system under which a school's faculty would be considered desegregated if no more than 75% and no less than 25% of teachers in the school are minority.[4] Under this "75–25 Plan," bilingual/ESL, vocational, and special education teachers would no longer be exempted from desegregation calculations. The School District would retain its Variance Committee to consider exceptional circumstances that may require a variance as a last resort. The 75–25 Plan would be enforced annually by the School District.

The most striking aspect of the School District's proposal is that it contemplates the use of involuntary teacher transfers to achieve and maintain the 75–25 ratio. The School Board adopted the 75–25 Plan, including the provision on involuntary transfers, in a unanimous resolution. (Def. Ex. 26). Such unanimity is remarkable, even unprecedented, for a Board that has so often been divided along racial lines. See *Tasby*, 869

---

4. For purposes of this plan, "minority" means Black, Hispanic, Native American, and Asian/Pa- cific Islander.

F.Supp. at 475. Equally impressive is the commitment of the Board, the Board President, and the Superintendent to use involuntary transfers to establish and maintain the 75–25 Plan. (Def. Ex. 26; Leos; Gonzalez). This resolve has never existed in connection with *Singleton.* (Collins).

### IV. The Continuing Applicability of Singleton & the 75–25 Plan

Courts throughout the South have long used, and continue to use, *Singleton* as a remedial measure to correct discriminatory assignment of teachers by race. *See, e.g., Mills v. Freeman,* 942 F.Supp. 1449, 1455–56 (N.D.Ga.1996); *Flax v. Potts,* 725 F.Supp. 322, 329 (N.D.Tex.1989), *aff'd,* 915 F.2d 155, 163 (5th Cir.1990). Of course, *Singleton* itself involved initial desegregation of Anglos and Blacks in relatively small school districts. Moreover, *Singleton* ratios may not have been intended to be maintained permanently. *See United States v. DeSoto Parish Sch. Bd.,* 574 F.2d 804, 819 (5th Cir.), *cert. denied,* 439 U.S. 982, 99 S.Ct. 571, 58 L.Ed.2d 653 (1978); *United States v. Wilcox County Bd. of Educ.,* 494 F.2d 575, 579 n. 2 (5th Cir.), *cert. denied,* 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974). The Court notes, however, that prior to its November 27, 1996 motion, the School District had never asked the Court to reconsider the applicability of *Singleton* to the DISD. *See Tasby,* 869 F.Supp. at 470.

■ The goal of the *Singleton* requirement, as with all of the Court's remedial measures, is "to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation." *Davis v. Board of Sch. Commr's,* 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971). In this regard, the Court observes that strict enforcement of *Singleton,* with the plus or minus 15% tolerance established in 1994, would necessitate the transfer of between 306 and 526 teachers.[5] (Def. Ex. 23). These transfers would disproportionately affect senior, Black teachers with long tenure at predominantly Black schools. (Collins).

By contrast, under the 75–25 Plan, far fewer teachers—between 82 and 116—would have to be transferred to achieve desegregation goals. Although the Intervenor Black Coalition currently seeks strict enforcement of *Singleton,* the Court. notes that no Black Trustee or citizen testified in support of that position at the hearing on May 27 & 28, 1997, or at the 1994 hearing.

■ All of the above leads the Court to the following conclusions: the DISD made an initial effort to comply with *Singleton* in 1971; however, in the Years since, the School District has failed to comply with the Court's orders regarding faculty assignment and is presently not in compliance; in lieu of *Singleton,* the School Board has unanimously adopted and expressed a long-term commitment to the 75–25 Plan. In the area of student assignment, the Court has long used a similar 75%–25% standard as the measure of student desegregation in DISD schools. *Tasby,* 869 F.Supp. at 457 n. 5.

In light of current circumstances, the Court concludes that the *Singleton* ratio is no longer a necessary or useful tool in the DISD and that the 75–25 Plan satisfies the requirement of the U.S. Supreme Court to achieve the maximum desegregation practicable in the area of faculty assignment. *Davis v. Board of Sch. Comm'rs,* 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971); *Green v. County Sch. Bd. of New Kent County,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). In this multi-ethnic school district, the 75–25 Plan achieves the ultimate purpose of *Singleton*—to eliminate racially identifiable schools. *Singleton,* 419 F.2d at 1217–18.

Although the Board's Resolution refers to the 75–25 ratio as a "rule-of-thumb guideline" used by the Department of Education's Office of Civil Rights (OCR) in its enforcement efforts (Def. Ex. 26), it appears that OCR does not have such a guideline. (Interv. Ex. 22). This makes no difference to the Court's decision. The Court relies on the representations contained in the Board Resolution (Def. Ex. 26) and repeated on the

---

**5.** These numbers assume that the Court will not approve the variances given by the School District's *Singleton* Variance Committee. If the Court were to approve those variances, but otherwise enforce *Singleton* with the 15% tolerance, between 206 and 288 teachers would have to be transferred to achieve compliance.

record by counsel, the Board President, and the Superintendent, that the 75–25 Plan will be permanent policy as the School District's measure of ethnic balance in faculty assignment, achieved—to the extent necessary—by involuntary transfers.

Therefore, the Court **APPROVES** the 75–25 Plan and **ADOPTS** it as the measure of faculty desegregation, subject to the following conditions:

1. In calculating the 75–25 ratio, all teachers on a campus shall be counted.

2. The Variance Committee may continue to operate and consider variance requests in genuinely exceptional circumstances. However, meetings of the Variance Committee shall be open to the public and the School District shall provide notice of Variance Committee meetings to the affected school's PTA president and School Centered Education (SCE) Committee. Notice shall also be given to the DISD's African–American and Latino Advisory Committees.

Furthermore, in light of the School District's past noncompliance with Court orders in the area of teacher assignment, the Court will require further reporting to ensure that the 75–25 Plan is being implemented successfully. Therefore, the DISD must file an initial status report *October 20, 1997,* and a follow-up status report early in the Spring semester at a date to be set by the Court. The status reports should present the ethnic breakdown of teachers in each school, summarize any action of the Variance Committee, and identify any problems in achieving compliance with the 75–25 Plan.

### V. Requested Approval of Past Variances

In light of the Court's adoption of the 75–25 Plan, the School District's request for approval of the variances heretofore granted by the *Singleton* Variance Committee has become **MOOT**. Even if these variances were approved, the DISD would not have achieved full compliance with the Court's orders in the area of faculty assignment. (Webster). Since the Court has today discarded the *Singleton* requirement, there is no reason to either approve or disapprove these variances.

Of course, the extent of the School District's good-faith efforts to comply with all the Court's orders will be a factor in determining when this case should ultimately be dismissed.

### VI. Conclusion

The School District's 75–25 Plan, as set forth in the School Board Resolution of May 30, 1997, is **APPROVED** effective with the beginning of the Fall 1997 semester.

SO ORDERED.