**Dorothy HOOTS, et al., Plaintiffs,**

v.

**Commonwealth of PENNSYLVANIA, et al., Defendants.**

**Civil Action No. 71–538.**

United States District Court,
W.D. Pennsylvania.

June 24, 2003.

Mark T. Fatla, Pittsburgh, Pa, for Plaintiffs.

## OPINION

COHILL, District Judge.

Before the Court is a motion filed by defendants Woodland Hills School District ("WHSD" or "the District") and the Commonwealth· of Pennsylvania (Doc. 1284), seeking a declaration of unitary status[1] and the end of judicial supervision of the District's schools. Plaintiffs, who represent a class of children and parents in the District, have filed a response in opposition. For the reasons set forth below, we will grant defendants' motion in its entirety, and end more than thirty years of judicial oversight of the Woodland Hills School District.

## Background

The facts underlying this case have been well documented, most recently in our Opinion and Order of July 25, 2000. *Hoots v. Commonwealth of Pennsylvania et al.,* 118 F.Supp.2d 577 (W.D.Pa.2000). As we explained in that Opinion, the District had its genesis during the 1960s, when the Pennsylvania Legislature enacted legislation to consolidate smaller school districts in the Commonwealth's public school system. The Commonwealth ultimately approved the creation of the General Braddock Area School District, which combined the school districts of the Boroughs of Braddock, North Braddock, and Rankin in eastern Allegheny County. These were all financially troubled districts, and they also contained the largest concentration of minority students in this portion of the county. The Commonwealth also approved the creation or preservation of several neighboring school districts which were overwhelmingly white and economically affluent, including the school districts of Turtle Creek, Swissvale Area, Churchill Area, and Edgewood. This case was originally filed in 1971, when plaintiffs, representing a class of parents and children in the General Braddock Area School District, challenged the newly created district as racially discriminatory.

The Court determined that the creation of the General Braddock Area School District was an act of *de jure* discrimination, in violation of the Fourteenth Amendment. *Hoots v. Commonwealth of Pennsylvania (Hoots II),* 359 F.Supp. 807, 823 (W.D.Pa.); *aff'd,* 495 F.2d 1095 (3d Cir.1974); *cert. denied,* 419 U.S. 884, 95 S.Ct. 150, 42 L.Ed.2d 124 (1974). The Commonwealth was adjudged to be the constitutional violator. What became known as the Woodland Hills School District was the product of a court-ordered merger of the General Braddock School district with the districts of Edgewood, Churchill, Swissvale, and Turtle Creek. The District began operation with the 1981–82 school year.

The second decade of this litigation saw the gradual development and implementation, in the face of strong community opposition, of a number of remedial plans designed to fully desegregate the District's schools and programs. We appointed a Hearing Officer, Mark T. Fatla, Esquire, to conduct a hearing on the parties' conflicting implementation plans. His Report and Recommendation issued on August 20, ·1990 (the "1990 R & R"). It was adopted, with certain exceptions, as the Opinion of

---

1. A school district which has eliminated the vestiges of a constitutional violation is said to be "unitary," because it no longer operates a dual, or segregated, educational system. *Freeman v. Pitts,* 503 U.S. 467, 489, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992).

this Court ("1991 Opinion & Order"), which set forth court-ordered remedies covering all aspects of school life in the Woodland Hills School District.

In October of 1999, the defendants each filed motions for a declaration that the District had complied in good faith with all Court-ordered remedies and achieved unitary status. The defendants requested that we dissolve the consent decree and cease judicial supervision over the school district's affairs. The District requested a gradual, rather than an abrupt, cessation of the court-ordered funds, programs, and personnel, and filed a proposed Transition Plan which would reduce the court-ordered remedial resources over a three-year period. A hearing on these motions for unitary status commenced on April 3, 2000, and closing arguments were heard on May 16 of that year.

By Opinion and Order dated July 25, 2000 (the "2000 Opinion and Order"), we found that the defendants had remedied the constitutional violation and thus achieved unitary status in the areas of student assignment, faculty and staff assignment, facilities, transportation, and activities. We also concluded that the vestiges of past discrimination in the areas of guidance and discipline had been remedied to the extent practicable, and that unitary status had been achieved in those areas as well. Accordingly, we held that judicial supervision over guidance and discipline was no longer necessary, with the condition that the Director of Guidance and guidance counselor positions at all grade levels be maintained, with appropriate clerical support, and then gradually reduced as set forth in the District's Transition Plan.

We also addressed the compensatory programs which had been implemented as part of the remedy. We concluded that the remedial compensatory programs designated as the Higher Order Thinking Skills ("HOTS") Program, Scholastic Aptitude Test ("SAT") Prep, and KIDS should no be longer part of the remedy for the remaining constitutional violation. We ordered that the remedial compensatory programs designated as the in-school tutoring labs for mathematics and the community based tutorial programs, be continued at current levels for the 2001–2001, 2001–2002, and 2002–2003 school years. The remedial compensatory programs designated as Reading Recovery, Summer Enrichment Program, and the Summer Learning Experience were to operate for the 2000–2001 school year and through the following summer.

However, we denied defendants' motions for unitary status in a small number of discrete but related areas. We found that a vestige of discrimination remained in curriculum, assessment and instruction, because the District had not yet fully complied with our previous orders to redesign the curriculum to eliminate tracking in mathematics. This prevented a finding of unitary status. We ordered the District to complete detracking in the mathematics curriculum by eliminating lower level courses and providing a single, detracked math curriculum, so that all students would have an equal opportunity to master the skills necessary to move ahead to the variety of math courses available at the high school level.

We stated that certain proposed changes in the math curriculum, presented in detail at the hearing, would satisfy our Order to detrack the math curriculum. At the same time, however, we emphasized that "[w]e do not intend to micromanage the District's curriculum, which is properly the function of the schools and the school board." 118 F.Supp.2d at 613.

We also denied defendants' motions for unitary status as to assessments and staff development. As part of the continuing

remedy in this case, we ordered the District to implement appropriate assessments and staff development to support the curriculum then in place as well as the redesigned math curriculum. We adopted the District's proposed Transition Plan for staff development as the remedy in this area.

Finally, as to the items contemplated in the District's Transition Plan and incorporated in the remaining remedy, we adopted the budget proposed in that Plan. We ordered that any additional funding necessary to implement the remedy continue to be funded ninety percent (90%) by the Commonwealth and ten percent (10%) by the District through the 2002–2003 school year.

To oversee the implementation of the remaining remedy, the Court reappointed Mark Fatla, Esquire to continue as Special Master. Mr. Fatla has conducted quarterly status conferences to review the District's compliance with our Order, and has kept the Court apprised of that compliance. His active involvement has immeasurably assisted us in overseeing this case.

Essentially, then, our Opinion and Order of 2000 found that unitary status had been achieved as to most issues, and provided a detailed framework through which the constitutional violations remaining in the Woodland Hills School District could be addressed. Based upon testimony at the hearing, we anticipated that this limited remedy would be fully implemented in approximately three years, and that the defendants would then again file motions for unitary status.

During the past three years, the District has provided plaintiffs, Special Master Fatla, and the Commonwealth with detailed quarterly Status Reports describing the efforts undertaken by the District to satisfy its remaining obligations. Those Reports have included budget information, attendance reports for the secondary math labs and after-school tutorials, and documents related to staff development, course selection guides, and curriculum guides. Our review of both those reports and the transcripts of the conferences shows that the plaintiffs raised no objections to the District's compliance during that time.

On November 6, 2002 defendants filed a joint motion for unitary status, seeking final dismissal of this action on grounds that the Commonwealth and the District had complied with the requirements set forth in our July 25, 2000 Opinion and Order. Plaintiffs filed a brief in opposition. After providing opportunity for discovery and depositions, we held a hearing on defendants' motion on May 12 and 13, 2003. Defendant WHSD presented the testimony of District Superintendent Dr. Ronald L. Grimm, Dr. Stefan Biancaniello, Dr. Joel Reed, Dr. Roslynne Wilson, and former District Superintendent Dr. Stanley Herman. Defendant Commonwealth entered portions of the expert report of Dr. James Henderson into evidence, but presented no witnesses. Plaintiffs called Mr. Norman Catalano to the stand.

Having considered all of the testimony and all of the evidence, as well as the submissions of the parties, we turn now to the question of whether the defendants have achieved unitary status in the areas remaining under our supervision, by complying, in good faith, with this Court's July 25, 2000 Opinion and Order.

### Legal Standards

Federal judicial supervision of a local school district is intended to be a temporary measure. *Board of Educ. v. Dowell,* 498 U.S. 237, 247–48, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991); *Coalition to Save Our Children v. State Bd. of Educ.,* 90 F.3d 752, 761 (3d Cir.1996.) The court's aim must be to remedy the constitutional violation, and then "to restore state and local authorities to the control of a school

system that is operating in compliance with the Constitution." *Freeman v. Pitts*, 503 U.S. 467, 489, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992) (citing *Milliken v. Bradley*, 433 U.S. 267, 280–81, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977)). "The duty and responsibility of a school district once segregated by law is to take all steps necessary to eliminate the vestiges of the unconstitutional de jure system." *Freeman*, 503 U.S. at 485, 112 S.Ct. 1430, 118 L.Ed.2d 108. When a school district has done so, we say that the district is now "unitary," because it no longer operates a dual, or segregated, system of education.

■ However, although achieving "unitary status" and thus relief from judicial supervision is the school district's goal, the term itself does not have a fixed meaning, "and does not confine the discretion and authority of the District Court in a way that departs from traditional equitable principles." *Freeman*, 503 U.S. at 487, 112 S.Ct. 1430, 118 L.Ed.2d 108 (citing *Dowell*, 498 U.S. at 245–46, 111 S.Ct. 630, 112 L.Ed.2d 715). Each school desegregation case must be evaluated on a careful assessment of its particular facts. *Freeman*, 503 U.S. at 474, 112 S.Ct. 1430, 118 L.Ed.2d 108. Unitary status requires more than a racially integrated school district; the constitutional obligation has not been met until the school district affirmatively has eliminated the vestiges of segregation. *Coalition*, 90 F.3d at 759 (citing *Green v. County School Bd.*, 391 U.S. 430, 437–38, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968)).

■ In deciding a motion for unitary status, the court must determine "whether the [constitutional violator] ha[s] complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable." *Coalition*, 90 F.3d at 760 (1996) (quoting *Freeman*, 503 U.S. at 492, 112 S.Ct. 1430, 118 L.Ed.2d 108).

■ Once a constitutional violation has been established, the defendant "bears the burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation." *Freeman*, 503 U.S. at 494, 112 S.Ct. 1430, 118 L.Ed.2d 108. "[T]here is a presumption that current disparities are the result of the defendant's unconstitutional conduct." *Jenkins v. Missouri*, 122 F.3d 588, 593 (8th Cir.1997).

■ When a court determines that a school district has attained unitary status, however, the burden of proving that any future disparities are caused by intentional segregation shifts back to the plaintiffs. *Jenkins*, 122 F.3d at 593.

Applying this general legal framework to the specific facts of this case, the Court makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact and Conclusions of Law

### Mathematics Curriculum

*Findings of Fact:*

Curriculum reform in accordance with the court-ordered remedy has been a complicated and protracted process in the Woodland Hills School District. We emphasized its importance in the 1990 R & R, when we concluded that "curriculum redesign is the framework upon which all other desegregation efforts rely." 118 F.Supp.2d at 592 (quoting 1990 R & R at 79). By 1990, the District had eliminated tracking in the elementary grades by grouping students in heterogeneous classrooms, but tracking still existed at the junior high and high school levels where minority students tended to be concentrated in standard courses but were virtually absent from advanced level courses throughout the curriculum. 118 F.Supp.2d at 592 (citing 1990 R & R at 32). Thus we ordered the District to undertake a broad

and comprehensive review of its courses, including content, sequencing, objectives, instructional and testing materials, and to hire the necessary personnel and consultants to develop and implement the appropriate changes in the curriculum.

The 1990 R & R specifically found that "a vestige of discrimination due to tracking remained in the secondary school math sequence." 118 F.Supp.2d at 592 (citing 1990 R & R at 33, 35). Pre-algebra, which was the entry point for all upper level math courses, was offered to students in grades 7 through 10. Our concern in 1990 was that students taking general math courses in seventh, eighth, and ninth grades, instead of pre-algebra, could not progress through the sequence of upper level math courses which included algebra, geometry, and calculus. 118 F.Supp.2d at 592 (citing 1990 R & R at 35).

By 2000, the District had generally complied with our order to revise the curriculum, but the mathematics curriculum remained problematic. Indeed, Dr. Herman testified that the math curriculum in the secondary schools had not been fully detracked. 118 F.Supp.2d at 596.

Therefore, we found that the District had not achieved unitary status in the area of curriculum and the related areas of assessments and staff development. We agreed with Dr. Herman's definition of detracking as having only one curriculum for any given course, and we ordered the District to eliminate lower level courses and provide a single, detracked math curriculum for all at the secondary level. 118 F.Supp.2d at 595. Our concern in 2000 was the same as it had been in 1990: the District continued to offer both academic and basic courses within the same subject areas, and this arrangement provided the children enrolled in academic classes with a more rigorous education and better prepared them for more advanced coursework than did the basic courses. *Id.* at 596.

In 2000, pre-algebra was still the entry point for all upper level math courses. Seventh graders could take basic math 7, pre-algebra, or algebra. We were disturbed by the fact that students could still enroll in pre-algebra as late as the eleventh grade, and therefore could not progress through the academic sequence of algebra, algebra II, geometry, and calculus. *Id.* at 596.

These concerns have now been remedied. The current WHSD math curriculum has eliminated lower-level courses such as pre-algebra, math 7, math 8, and consumer math. Tr., 5/12/03, at 18, 25, 35–37; Tr., 5/13/03, at 88–90, 156; Commw. Ex. 1410, ¶ 5; WHSD Exs. 53, 120. The District has implemented a Connected Mathematics curriculum for students in the sixth, seventh, and eighth grades. Tr., 5/12/03, at 34–36; Tr., 5/13/03, at 156; Commw. Ex. 1410, WHSD Exs. 53, 120. Beginning with the 2003–2004 school year, all students must enroll in algebra I no later than the ninth grade. Tr., 5/12/03, at 39; Tr. 5/13/03, at 106–108, 142.

Within a given mathematics course, the curriculum is now the same for all students. In other words, all students experience the same academic instruction, and there are no advanced or slower sections in a given course. For example, Cognitive Tutor Algebra, also known as PUMP Algebra, is the exclusive vehicle for the delivery of algebra instruction for all students. Tr., 5/12/03, at 37–38; Tr., 5/13/03, at 88, 156, 163; Commw. Ex. 1410, ¶ 4; WHSD Exs. 53, 120. Similarly, Cognitive Tutor Geometry and Cognitive Tutor Algebra II are the curricula used for these courses. Tr., 5/12/03, at 37, 4/13/03, at 96.

\*

■ Although all students must enroll in algebra I by the ninth grade, a small number of students will take algebra I in

the seventh or eighth grade. Plaintiffs contend that this is tracking.

We disagree. Defendants have established that algebra I, regardless of whether a student takes it in the seventh, eighth or ninth grade, is taught through a single curriculum. Furthermore, it is required by the ninth grade, which means that all students have the opportunity to progress through geometry, algebra II, and trigonometry. Since the District requires three credits each of math and science, and a fourth credit in either of these disciplines in order to graduate from Woodland Hills High School, students must select at least two math courses from the wide variety of courses in the current math curriculum after completing algebra I.

Credible evidence was presented to establish that students achieve the developmental readiness to enroll in algebra I at different grade levels, and that the District best serves the educational needs of its students by offering algebra I when an individual student is prepared to take it. Tr., 5/13/03, at 5, 30, 91–93.

\*

Plaintiffs also argue that the process used to select those students who will take algebra I before the ninth grade is a form of tracking, because it relies on subjective teacher recommendations that are necessarily based upon a student's perceived ability. The District has adopted four (4) criteria to be used in evaluating whether a student should be recommended to enroll in algebra 1 at the seventh grade level. Those criteria are (1) a student's fifth and sixth grade math grades, (2) teacher recommendations, (3) standardized achievement test scores, and (4) the student's score on an algebra readiness exam. Tr., 5/13/03, at 6–7. Students are not given the algebra readiness exam unless they meet the first three criteria.

We are not persuaded by plaintiffs' interpretation of the criteria used to determine when a student may enroll in algebra I. Standardized achievement test scores, and, though perhaps to a slightly lesser extent, a student's previous math grades, provide objective measurements of an individual student's readiness for algebra I. The teacher recommendations are quite detailed: they must specify the student's mathematical strengths, indicate the reasons for the recommendation, and include samples of the student's work that support the recommendation. Pls.' Ex. 10 at 6278. We agree with Dr. Grimm, who testified that a teacher who has taught a child throughout the year is qualified to make a recommendation of that child's readiness and ability to handle mathematical reasoning. Tr., 5/12/03, at 97.

A student who is not recommended for algebra I in the seventh grade is enrolled in Connected Math 7, which is also a rigorous academic curriculum. Moreover, parents may override the District's recommendation concerning whether a student is prepared to take algebra I in the seventh grade. Tr., 5/12/03, at 95–96. Plaintiffs object that parents are not properly notified of the possibility of enrolling their children in algebra I in the seventh grade, and point to the absence of a written communication offering parents of sixth graders the option of algebra I for the coming school year. Testimony on this issue generally established that the District does not directly ask parents for their input on this decision. However, both Dr. Grimm and Dr. Wilson testified that information about the seventh grade math courses is explained to parents of sixth graders during orientation nights. Tr., 5/12/03, at 111–112; Tr., 5/13/03, at 26–28. Plaintiffs presented the testimony of Norman Catalano, Curriculum Coordinator for Math and Science, who also stated that parents receive this information at orientation. Tr., 5/13/03, at 188. We see no evidence of discrimination in this format. Indeed, it

would be extreme micromanagement for us to tell the District how to handle orientation for sixth graders and their parents.

The District's selection criteria and the means of providing this information to parents reflects the fact that most students are simply not ready for algebra I in the seventh grade. For the 2002–2003 school year, of the 393 regular education students in seventh grade, 355, or 90%, were enrolled in Connected Math 7. Only thirty-eight students, or 10%, of the seventh grade students were enrolled in Cognitive Algebra I. Of those 38 students who are enrolled in algebra I, nearly 24% of them are African–American. Tr., 5/12/03, at 108–109, WHSD Ex. 122. The District's current and former administrative team testified that there is no evidence that the criteria for making a recommendation of algebra I readiness are applied or were applied in a racially biased manner or have any built-in racial bias, and we find that testimony to be credible. Plaintiff produced no evidence to the contrary. Tr., 5/12/03, at 110, Tr., 5/13/03, at 29–30, 8. There is nothing to suggest that the District's approach to this issue is in any way guided by race, or that the selection process is in any way arbitrary or discriminatory.

\*

Plaintiffs would have us hold the District strictly to the specific curricular changes described by Dr. Herman and Dr. Joel Reed in their testimony during the 2000 hearing, and deny unitary status because a somewhat different curriculum is now in place.

Dr. Herman, then-Superintendent of the Woodland Hills School District, testified in 2000 that when the mathematics curriculum was fully revised, all students would follow the same curriculum through the eighth grade, and algebra I would be offered to all eighth grade students. Tr., 4/10/00, at 112–114. Students in the sixth and seventh grades would take Connected Mathematics. Tr., 4/10/00, at 93. Dr. Joel Reed, the Curriculum Coordinator for Math and Science during the 2000 hearing, similarly testified that all students would likely be taking Connected Math instead of algebra I in the seventh grade. Tr., 4/25/00, at 136–137.

Plaintiffs are correct when they state that the District has not implemented these exact changes. However, we will not deny defendants' motion for unitary status on this ground.

As we wrote in our 2000 Opinion:

The District shall complete detracking in the mathematics curriculum by eliminating lower level courses and providing a single, detracked math curriculum for all at the secondary level. Implementation of the District's present plans, which were the subject of much testimony at the hearing and which have been detailed elsewhere in this Opinion, would satisfy our order to provide a single, detracked curriculum. These changes include the revision of the [mathematics curriculum], the implementation of Connected Mathematics for all students in the 6th, 7th, and, perhaps, 8th grades; the implementation of Pump Algebra for all students at the same grade level; and the elimination of pre-algebra, math 7, and math 8, which the Court has determined are lower level courses. Testimony indicated that the District expects to complete these changes in three years.

118 F.Supp.2d at 613.

We emphasized in 2000 that "[w]e do not intend to micromanage the District's curriculum, which is properly the function of the schools and the school board. However, these changes were proposed by the District, and would meet our requirements to detrack this curriculum." *Id.* In other words, we did not see these as the *only*

changes in the math curriculum which could accomplish this goal. Indeed, one of the difficulties inherent in cases such as this, is that what constitutes best practice may change over time; accordingly, curricular changes may be planned which may not, in the end, be the best approach for the students. Although the testimony presented in 2000 led us to conclude that all students would be taking algebra at the same time, the District's decision to continue to permit a small number of students to enroll in algebra I in seventh or eighth grades does not indicate that the District is creating higher and lower level tracks in its math curriculum.

During the 2000 evidentiary hearing, the District introduced WH Ex. 53, which set forth its planned mathematics curriculum revisions for the years 2000–2001 through 2002–2003. The District has completed all of the revisions identified on WH Ex. 53. Tr., 5/12/03, at 34–36. Dr. Grimm testified that the District has revised the K through 6 math curriculum by implementing Everyday Math in the first through the sixth grades, Connected Math in the sixth and seventh grades, and Cognitive Tutor or PUMP Algebra by the ninth grade. Tr., 5/12/03, at 34–35. The District has complied with our Order to eliminate lower level courses. Pre-algebra, general math 7 and 8, and consumer math have been eliminated from the curriculum. Tr., 5/12/03, at 36–37.

Dr. Grimm testified that the math curriculum has been detracked, and we find that testimony to be credible. He stated that a single curriculum is offered in every section of each math course. Tr., 5/12/03, at 38–39.

The District also presented the testimony of Dr. Stanley J. Herman, former District Superintendent, who testified as an expert in the fields of public education, public school policy, curriculum and curriculum alignment, instruction and supervi-

sion, and standards-based curriculum and instruction. Tr., 5/13/03, at 75. Dr. Herman testified that, in his opinion as an education professional, the District's math curriculum is a rigorous one. Students must complete three credits in both math and science, and must complete a fourth credit in either subject area to graduate. Tr., 5/13/03, at 87, 89–90. Dr. Herman testified the District's secondary mathematics curriculum is not tracked, and the Court finds this testimony to be credible. Tr., 5/13/03, at 91, 93.

*Conclusions of Law:*

The Court concludes that there is no tracking present in the District's secondary mathematics curriculum. All vestiges of past discrimination have been remedied, and the District has achieved unitary status with regard to the curriculum.

**Assessments and Staff Development**

*Findings of Fact:*

Our conclusion in 2000 that the District had not achieved unitary status in the area of assessments and staff development, was directly related to our determination that the mathematics curriculum remained to be detracked. We ordered the District to implement the appropriate assessments and staff development as it revised this curriculum, and directed that funding be continued as set forth in the Transition Plan.

Testimony at the hearing established that the District has complied with every aspect of the Court's remedial Order with respect to assessments and staff development. The District implemented and continues to employ appropriate assessments and staff development in accordance with the Transition Plan. Tr., 5/12/03, at 45–49, 145–147, 170–171, 178; WHSD Exs. 102, 104, 121. Several of the District's mathematics courses, specifically Cognitive Tutor Algebra 1, Cognitive Tutor Algebra 2,

Cognitive Tutor Geometry, Connected Mathematics 6, Connected Mathematics 7, Connected Mathematics 8 and the K 5 Every Day Math curriculum, contain built-in assessments which are aligned to the written curriculum and the District makes use of those appropriate assessments in those courses. Tr., 5/12/03, at 48–49.

The District created through the staff development portion of the Transition Plan an administrative structure capable of managing ongoing curricular and instructional adjustment in the absence of court-ordered funds and personnel. Tr., 4/12/03 at 145–146.

■ Plaintiffs assert that unitary status in this area must be denied because there is evidence that some teachers continue to have low expectations for their students, and because the District has not put in place an instrument to measure the effectiveness of its staff development. Plaintiffs' evidence of teacher bias is not persuasive, and their argument that WHSD does not adequately assess its own staff development would have us add requirements that go beyond the scope of our 2000 Order. We will not withhold a finding of unitary status for these reasons.

*Conclusions of Law:*

The District has complied with our 2000 Opinion and Order and has remedied all vestiges of past discrimination and achieved unitary status in assessments and staff development.

**Remedial and Compensatory Programs**

*Findings of Fact:*

The District has fully complied with our 2000 Opinion and Order in these areas.

In compliance with that Order, Dr. Grimm testified that Reading Recovery, the Summer Enrichment Program, and the Summer Learning Experience were continued through the 2000–2001 school year and the following summer. Tr.

5/12/03, at 53; Commw. Ex. 1410, ¶ 14; WHSD Ex. 110. The District also maintained the community based tutorial program and in-school tutoring labs for mathematics. Tr. 5/12/03, at 50; Comm. Ex. 1410, 12–13; WHSD Ex. 110.

■ Plaintiffs argue that the District has failed to secure outside monies to continue many of these programs without court-ordered funding. We have long recognized the value of these remedial programs, particularly the tutoring programs. The District, too, acknowledges the importance of the after-school tutorials, and has, albeit to a limited extent, applied for grants to continue them. Tr. 5/13/03, at 59–61. Thus far, the District has been unsuccessful in this regard. However, we did not order the District to secure new funding to maintain these programs for the simple reason that to do so would be to micromanage the District's affairs.

We have no doubt that the District wants all of its students to achieve a high level of proficiency in mathematics. This is clearly evident in curriculum in place for the 2003–2004 school year. Dr. Grimm testified that new programs will provide extra support for math skills to students in the seventh and eighth grades. Tr., 5/12/03, at 41–42. The District has established a program known as "Math Plus" to increase the amount of instructional time spent on mathematics at the junior high level. Under this program, each math course is taught so that each student receives nine (9) periods of instruction in mathematics during each 6 day rotation. Tr., 5/12/03, at 41. All students in the seventh and eighth grades will take Math Plus. Tr., 5/12/03, at 42.

Also beginning with the 2003–2004 school year, the District will offer PSSA 9 at the ninth grade level. This course will provide additional instruction for all students who have not reached a proficient

level on the state-wide, standardized eighth grade mathematics PSSA exam. Tr., 5/12/03, at 42.[2] Dr. Grimm explained that students will not receive academic credit for this course, which replaces a study hall in the ninth grade schedule. It is designed to provide additional mathematics support to those students who need it. Tr., 5/12/03, at 42–44. The District anticipates offering similar help to students who need it at the eleventh and twelfth grade levels. Tr., 5/12/03, at 44.

We are confident that even if court-ordered remedial programs cannot be continued due to lack of funding, the District will continue to provide extra support in mathematics for all students who need it.

*Conclusions of Law:*

In compliance with our 2000 Opinion and Order, the District has remedied all vestiges of past discrimination and has achieved unitary status with respect to court-ordered compensatory programs.

### Guidance Department

*Findings of Fact:*

In our 2000 Opinion and Order, we found that the District had achieved unitary status in the area of guidance and discipline. However, we required that certain guidance personnel be retained for a transition period while the District completed the redesign of its curriculum and assessments. 118 F.Supp.2d at 611. Guidance personnel were to be retained and gradually reduced as proposed in the defendants' Transition Plan. The District has fully complied with our 2000 Order in this area. The District has maintained a Director of Guidance position, as well as guidance counselor positions and corresponding clerical support, in accordance with the Transition Plan. Tr., 5/12/03, at 54–56; Tr., 5/13/03, at 158; WHSD Ex. 115.

Plaintiffs contend that the District's guidance counselors have failed to meet their obligations under the 2000 Order to place students without regard to ability and to encourage all students to enroll in higher level courses. Instead, plaintiffs argue, guidance counselors work with teachers to select or reject certain students for advancement into algebra 1 in the seventh and eighth grades. We have previously rejected plaintiffs' position that enrolling some students into algebra before the ninth grade constitutes impermissible tracking, and have concluded that the selection process used to make these decisions is not discriminatory. We decline to revisit the same arguments in the context of the guidance department. Defendants achieved unitary status in the area of guidance in 2000, and plaintiffs have presented no evidence to show that this is no longer so.

We also reject plaintiffs attempt to relitigate the question of Advanced Placement courses. We held in 2000 that "these courses do not represent tracking in the traditional sense, and we do not see this as a vestige of discrimination." 118 F.Supp.2d at 595, n. 15. Once a court has determined that unitary status has been achieved, plaintiffs bear the burden of proving that new disparities have been caused by intentional segregation. *Jenkins*, 122 F.3d at 593. Plaintiffs have pre-

---

**2.** It is undisputed that the Pennsylvania System of School Assessment ("PSSA") scores for the District's students, regardless of ethnicity, show that a great number of students do poorly on this exam. Pls.' Ex. 16, 18., Tr., 5/12/03, at 62–69. Our 2000 Opinion and Order held that any disparity in achievement, though extremely troubling, was not a vestige of the constitutional violation in this case. We concluded that the District had done everything practicable to reduce the racial disparity in academic achievement, and that the fact that a disparity existed would not bar a finding of unitary status. 118 F.Supp.2d at 603. We find no reason to revisit that conclusion.

sented no evidence to cause us to revisit this issue.

In 2000, we found that the secondary guidance counselors encouraged all students, regardless of race, to take upper-level courses. 118 F.Supp.2d at 607. Dr. Roslynne Wilson, Assistant Superintendent at Woodland Hills, works with the guidance counselors in each of the District's schools. Dr. Wilson testified that this is still the case, and we find her testimony credible. Tr., 5/12/03, at 24–25. Dr. Wilson further testified that, as we found in 2000, the District continues to make Advanced Placement courses available to any students who wish to take them. Tr., 5/13/03, at 31–32.

*Conclusions of Law:*

After considering the evidence and testimony of record, we conclude that the District has complied in all respects with our 2000 Order in guidance, an area in which unitary status was achieved in 2000.

### Good Faith

We have determined that the vestiges of past discrimination have been eliminated to the extent practicable in all of the District's programs and curricula. This, however, does not end our inquiry. We turn now to the second prong of the Supreme Court's standard for unitary status, and consider whether the defendants have complied in good faith with our desegregation orders. *Dowell*, 498 U.S. at 249–50, 111 S.Ct. 630, 112 L.Ed.2d 715.

In addition to looking backward toward the defendants' conduct during the course of the litigation, a good faith inquiry in the context of a motion for unitary status also requires that we look to the future. We must consider whether the school district's record of performance inspires confidence that it will continue to be concerned with providing an equal educational opportunity for all of its students. *Mills v. Freeman*, 942 F.Supp. 1449 (N.D.Ga.1996).

In 2000, we found that the defendants had shown the requisite good faith to support a finding of unitary status. We reach the same conclusion today. The evidence shows that both the District and the Commonwealth have complied in good faith with all of the remaining obligations set forth in our 2000 Opinion and Order.

Plaintiffs argue that the District has failed to comply in good faith with that Order for several reasons. They contend that the District's guidance counselors do not encourage all students to take upper-level courses and that black students are disproportionately enrolled in less challenging math courses; that the mathematics curriculum has not been de-tracked because some students are eligible for algebra 1 in the seventh or eighth grades while others must wait until ninth grade; and that the District has failed to secure outside funding for remedial programs that will no longer be under the Court's supervision. We have addressed these arguments above and concluded that nothing in the record indicates that unitary status has not been achieved. We have found that the mathematics curriculum has been detracked, and that the District was under no obligation to find new funding for discontinued remedial programs.

The evidence adduced at the hearing convinces us that the District has been effective in enrolling its students in algebra I and other upper-level math courses. Of the District's 481 regular education students in the ninth grade in 2002–2003, 228 were enrolled in Cognitive Tutor Algebra 1, 192 were enrolled in Cognitive Tutor Geometry, 45 students were enrolled in Math Technology 1 and 3 students (most likely students who were repeating the ninth grade) were enrolled in Business Math. Tr., 5/12/03 at 112–114, WHSD Ex. 123. Those ninth grade students who took

math technology I or business math this year will be required to take algebra 1 in the 2003–2004 school year. *Id.* Beginning with the 2003–2004 school year, all ninth grade students who have not previously enrolled in algebra I will be required to do so. Math technology and business math will no longer be options for ninth grade students.

Even with the former curriculum in place, students at Woodland Hills High School are enrolling in upper-level math courses. Current statistics show that of the District's 380 regular education students in the twelfth grade in 2002–2003 who completed more than two years within the District, 379 of those twelfth graders, or 99.48%, had taken algebra I; 354, or 92.91%, had taken geometry; 291, or 76.38%, had taken algebra II; 177, or 46.46%, had taken trigonometry; and 79, or 20.73%, had taken calculus. Tr., 5/12/03 at 119–121, WHSD Ex. 107.

In 2000, we stated that, with the single exception of the District's failure to eliminate tracking in mathematics, Woodland Hills was providing an "equal educational opportunity to all of its students, regardless of race." 118 F.Supp.2d at 612. We concluded that the defendants had shown the requisite good faith for a finding of unitary status in all areas except the math curriculum and related assessments and staff development. The District's programs and decisions during the past three years have done nothing to cause us to doubt that conclusion, and the defendants have shown good faith in fulfilling every aspect of our 2000 Order. We therefore find that the defendants have shown the requisite good faith which is a key component of our decision that unitary status has been achieved.

### Defendant Commonwealth's Obligations

■ Our 2000 Order required the Commonwealth of Pennsylvania, as the constitutional violator in this case, to continue funding 90% of the remedies. There is no dispute that the Commonwealth made all required payments to WHSD, and has paid in excess of $5,000,000 over the past three years to enable WHSD to complete its remedial obligations. Tr., 5/12/03, at 58; Tr., 5/13/03, 159; Comm. Exs. 1401–1407; Stipulation and Order dated May 9, 2003.

The Commonwealth also provided appropriate oversight of the District's remedial efforts by attending all of the quarterly status conferences, reviewing WHSD's quarterly status reports and engaging Dr. James Henderson, Dean of Duquesne University's School of Education, to review and evaluate WHSD's compliance activities. Tr., 5/12/03, at 58; Tr., 5/13/03, at 159–160; Commw. Exs. 1408–1409.

The Commonwealth has, in good faith, taken all actions necessary to satisfy its obligations as set forth in the Court's Opinion and Order dated July 25, 2000. *Conclusions of Law*

The Commonwealth has complied in good faith with all of the remaining obligations set forth in the Court's Opinion and Order dated July 25, 2000. The Commonwealth has thus satisfied its constitutional obligation to eliminate all vestiges of past discrimination to the extent practicable.

### Conclusion

The record before us demonstrates that the defendants have complied in good faith with this Court's 2000 Opinion and Order. We therefore conclude that the vestiges of past discrimination have been remedied, that unitary status has been achieved, and that judicial oversight is no longer necessary. The Woodland Hills School District is unitary in all of its operations, facilities, programs, personnel and curricula, and offers its educational benefits equally to all

students. Accordingly, we will grant defendants' motion.

The prior constitutional violation has been remedied, and it is now appropriate for us "to restore state and local authorities to the control of the school system that is operation in compliance with the Constitution." *Freeman v. Pitts*, 503 U.S. at 489, 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992) (citing *Milliken v. Bradley*, 433 U.S. at 280–281, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977)). The Woodland Hills School District is no longer in need of additional remedial relief or judicial supervision, and we will vacate the supervisory decree and dismiss all remaining claims against the District and the Commonwealth with prejudice.

It seems appropriate to note here that a number of individuals and entities deserve credit for bringing this case to a successful conclusion after thirty-two years. Counsel for all parties, our Special Master, the Woodland Hills School Board and the administrators of the school district all deserve credit for their efforts and cooperation.

The late Judge Gerald Weber handled this case from its inception until his death in 1989. It was he who suffered the "slings and arrows" which all too often accompany these types of cases. His courageous oversight, despite threats to his life, provided the framework for the successful termination of the case which we resolve here today.

An appropriate Order follows.

### ORDER

AND NOW, to-wit, this _____ day of June, 2003, for the reasons set forth in the accompanying Opinion, it is hereby ORDERED, ADJUDGED and DECREED as follows:

1. defendant Commonwealth of Pennsylvania and defendant Woodland Hills School District have complied with the requirements set forth in this Court's Opinion and Order dated July 25, 2000;

2. the vestiges of past discrimination have been remedied to the extent practicable;

3. the Woodland Hills School District be and hereby is declared to be unitary;

4. the supervisory decree in place in this action be and hereby is vacated;

5. defendants' Motion for a Declaration of Unitary Status (Doc. 1284) be and hereby is GRANTED;

6. and all claims remaining against the defendants be and hereby are DISMISSED WITH PREJUDICE.

The Clerk of Court be and hereby is directed to mark this case as "closed."